UNITED STATES DISTRICT COURT
WETERN DISTRICT OF NEW YORK

---

JOSUE S. CABRERO-GONZALEZ,

                              Plaintiff,

                                                    Case No. 13-CV-6184-FPG

v.

                                                    DECISION & ORDER

CAROLYN W. COLVIN,
Acting Commissioner of Social Security
Administration of the United States,

                              Defendant.

---

## I.    INTRODUCTION

*Pro se* Plaintiff Josue S. Cabrero-Gonzalez ("Plaintiff") brings this action pursuant to

Titles II and XVI of the Social Security Act ("SSA"), seeking review of the final decision of the

Commissioner of Social Security ("Commissioner"), which denied his applications for a period

of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  ECF No. 1.  The Court has jurisdiction over this matter under 42 U.S.C. §§ 405(g) and

1383(c)(3).

Before the Court for determination is the Defendant's Motion for Judgment on the

Pleadings consisting of a Notice of Motion (ECF No. 11) and a Memorandum of Law in Support

of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 11-1), filed pursuant to Federal Rules

of Civil Procedure 12(c).  Additionally, Defendant filed a Certificate of Service by Mail stating

that on March 4, 2014, these filed documents were mailed by the United States Postal Service to

Plaintiff at the following address: 387 First Street Up, Rochester, New York 14605.  (ECF No.

11-2).   Plaintiff has not responded to the Defendant's motion.[1]   The absence of a response by Plaintiff does not relieve this Court of its obligation to review the decision of the Commissioner.

For the reasons set forth herein below, I find that the final decision of the Commissioner is supported by substantial evidence within the record[2] and accords with applicable legal standards.   Therefore, this Court grants the Commissioner's Motion for Judgment on the Pleadings, and orders that the Complaint be dismissed.

## II.   BACKGROUND

### A.   Procedural History

Plaintiff applied for a period of disability and DIB on November 18, 2009 and SSI on March 11, 2010, alleging in both applications disability due to psychiatric disorders, asthma, a heart condition, a right knee condition, and black outs, with an onset date of June 21, 2008.  R. 31.  His applications for DIB and SSI benefits were denied administratively on May 27, 2010. R. 31-32, 73-74, 84-99.   On July 26, 2011, Plaintiff, represented by his attorney Justin M. Goldstein, Esq., appeared and testified at a video administrative hearing held before Administrative Law Judge Lawrence Levey ("ALJ").  R. 29-62.  Vocational Expert Dennis P. Conroy ("VE") appeared and testified, as well.  R. 31, 62-69.   At the conclusion of the administrative hearing, the ALJ held the record open for two weeks[3] for Plaintiff's attorney's submission of additional evidence from Jefferson Family Medical Center ("JFMC"), Genesee Mental Health Center ("GMHC"), Four Winds Hospital Center ("FWHC"), Evelyn Brandon

---

[1]Although Defendant referenced its opposition to Plaintiff's Motion for Judgment on the Pleadings in the title of the legal memorandum submitted in support of its Motion for Judgment on the Pleadings, Plaintiff did not file such a motion or respond to Defendant's submission. ECF No. 11-1.
[2]All references to the Administrative Record are reflected herein as ("R."), along with the associated page number(s).
[3] Plaintiff's attorney timely submitted supplemental medical records from EBMHC and the U of R (R. 292) and, thereafter, requested that the ALJ hold the record open for an additional two weeks for submission of additional medical evidence. R. 293.

Mental Health Center ("EBMHC"), and from Plaintiff's neurologist and cardiologist at the University of Rochester ("U of R").   R. 32-36, 69-70.

On September 23, 2011, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled.   R. 12-24.   The Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner on February 4, 2013.   R. 1-5. Subsequently, on April 9, 2013, Plaintiff timely commenced this action in the United States District Court for the Western District of New York appealing the Commissioner's decision on the ground that it "was erroneous and not supported by either the substantial evidence on the record or the applicable law."   ECF No. 1.

## B.   Factual Background

At the administrative hearing held on July 26, 2011, Plaintiff's representative alleged disability based upon "listing 12.02, alternatively listings 12.03, 12.04, and listing 12.08 based upon the medically determinable impairments of psychotic disorder, bipolar disorder, oppositional and defiant disorder, post-traumatic stress disorder, mood disorder, borderline personality disorder, depressive disorder, supraventricular tachycardia, hypertension, right knee disorder, epilepsy, and asthma."[4]   He also alleged an alternative basis: "the framework of GRID rule 201.00(h)(3)[5] due to the [Plaintiff's] inability to perform less than the full range of unskilled sedentary work on a regular and continuous basis."   R. 37-38.

---

[4] The referenced listings found in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments, pertain to the evaluation of disability on the basis of medically determinable mental disorders in diagnostic categories: organic mental disorders (12.02); schizophrenic, paranoid, and other psychotic disorders (12.03); affective disorders (12.04); personality disorders (12.08).

[5] The Medical-Vocational Rule 201.00(h)(3) found in 20 C.F.R. Pt. 404, Subpt. P, App. 2, specifies for "Maximum sustained work capability limited to sedentary work as a result of severe medically determinable impairments" that:

> Nevertheless, a decision of 'disabled' may be appropriate for some individuals under age 45 … who do not have the ability to perform a full range of sedentary work.   However, the inability to perform a full range of sedentary work does not necessarily equate with a finding of 'disabled.' Whether an individual will be able to make an adjustment to other work requires an adjudicative assessment of factors such as type and extent of the individual's limitations or restrictions and the

3

At the time of the administrative hearing, Plaintiff was 26 years old, 5'4¾" tall, weighed approximately 200 pounds (fluctuating during the year between 180 and 210 pounds), had completed high school, achieved two years towards a Bachelor's degree in aircraft operations, and had been discharged from the military after three months of basic training due to a myocardial infarction or irregular heartbeat, and a dislocated knee. R. 38, 39-40, 371. Plaintiff had received truck driver training, had Class A and passenger driver's licenses, and possessed an instructor's certificate and a security license. R. 40-41. His employment history included part-time work as a driving instructor for the Morgan School of Driving ("Morgan"), a security guard, and medical transportation driver, and past work including supermarket cashier, cashier at Target, high school clerk, video store customer service, UPS driver helper, fast food restaurant fried cook, Job Corps, and supermarket deli. R. 41-47, 227, 235-61.

Plaintiff testified that he last worked part-time for Morgan on the Saturday before the administrative hearing due to several incidents, including hallucinogenic attacks during lessons and things happening on the road and in his head that were not really occurring, but was still employed by the company. R. 41-42. He had worked full-time for the company for about two months in 2010, but because he experienced stress on the road and blacked out, left a student in the car, and got into a physical fight with another driver, he switched to part-time. R. 42-43. Plaintiff testified that he had blackouts triggered by stress, anger at a stressful situation, or feeling threatened, two or three times per week and they lasted for varying lengths of time. R. 43-44. At Morgan, blackouts happened five times in 2010, three times in 2011; at Rochester Medical Transportation ("RMT"), a weekly occurrence; but at U.S. Security, not too often. R.

extent of the erosion of the occupational base. It requires an individualized determination that considers the impact of the limitations or restrictions on the number of sedentary, unskilled occupations or the total number of jobs to which the individual may be able to adjust, considering his or her age, education and work experience, including any transferable skills or education providing for direct entry into skilled work.

44. He was terminated from his job as a medical transport driver for RMT after he dropped a patient during a panic attack. R. 47. He stated that he last had a panic attack three months ago, but got into altercations with others once a month, and had been arrested plenty of times due to problems with his temper and feeling threatened. R. 49. Every morning, according to Plaintiff, he woke up depressed and didn't get out of bed two to three days a month, but more often felt manic, pushed the limits, and strived to be first or make top line without thinking about his safety or the safety of others. R. 50-51. Additionally, he tried suicide two or three times a year and had been hospitalized in February 2011 for three days, and for one day another time. R. 51-52. Although he had taken medication for psychiatric conditions as a teen and again after discharge from the Army, he was not taking any now, but was receiving psychotherapy. R. 53-54. For his physical conditions of irregular heartbeat, knee and ankle problems, asthma, arthritis, back and head pain, Plaintiff was taking Albuterol, Flovent, heart pills, steroids, nebulizer treatment, pain management, muscle relaxers and anti-inflammatory medication. R. 54. He described frequent asthma attacks and "microseizures," but stated that the sharp and extremely debilitating chest pains no longer occurred due to medication prescribed by his main doctor, Dr. Brown. R. 55-56. Regarding the "microseizures," Plaintiff had seen a neurologist at the University of Rochester and had an EEG and an MRI which showed nothing to be concerned about. R. 57. Plaintiff testified regarding daily back pain stemming from a slipped disk which affected him if he walked, stood, or sat for a long period of time, i.e., 20-30 minutes. R. 57-58. He stated that his wife took care of everything in the housework department because he worked. R. 58. He had no hobbies and socialized with his wife and child, and occasionally with his brother and a friend. R. 58-59.

Responding to questions posed by the ALJ, Plaintiff stated that the blackouts which began at age nine were consistent, but had worsened in the last six months. R. 60. Plaintiff

5

acknowledged that when he first began to see Dr. Brown, he was unwilling to undergo psychological evaluation, his major area of disability, but disagreed with Dr. Brown's note that medically he had no limitations for working because they hadn't gone into detail about his history at that time. R. 60-61. Plaintiff testified that he never followed through with unemployment applications due to blackouts, and that he self-medicated by smoking marijuana daily to keep calm, focused and more submissive; he just could not do marijuana when working. R. 62.

On a Disability Report form with pain questions, dated April 20, 2010, Plaintiff explained how his illnesses, injuries, or conditions limited his activities. R. 194-204. He stated that he lived with his wife and daughter in an apartment, did not need any special help or reminders to care for his personal needs, needed alarm reminders to take his medicine, daily prepared meals in the microwave (preparation took 10-15 minutes), and shopped in stores for food once a month. R. 194-198. Plaintiff stated that he was able to pay bills but needed help handling his finances due to compulsive spending. R. 198. Plaintiff listed his sole hobby as watching TV daily, stating that he really did not like to go out. *Id.* He indicated that he used a cane, a brace/splint, and wore glasses, all of which were used when walking long distances and had been medically prescribed by a doctor whose name he could not recall. R. 200. He stated that he could walk continuously for five miles, but needed to rest five minutes to continue walking. *Id.* Alleging problems paying attention, Plaintiff stated that he "can't focus," can't finish what he starts, and gets frustrated and quits. *Id.* He had problems getting along with bosses, teachers, police, landlords, or other people in authority and had lost multiple jobs for insubordination. *Id.* Plaintiff stated that he first experienced pain in November 2003, and it began to affect his activities in June 2004. R. 202. He described "dull and sharp" pain in his back, knee, and ankle joints which "could start off in one place and spread all around," for which he was not taking

medication and had no special tests to evaluate. *Id.* He said he showered and took pain pills to relieve the pain. R. 204. His daily activity was watching TV, and the pain affected him in that he didn't like to go out. *Id.* Plaintiff stated that his wife could talk about his pain and how it affected his activities. *Id.*

On another Disability Report-Adult form, Plaintiff described the medical conditions for which he sought disability as "bipolar, post traumatic stress, asthma, heart problems, panic attacks, right knee ligament tear, and black outs," and stated that these conditions caused pain or other symptoms. R. 225. He listed Albuterol, for asthma, as the only medication he was taking, and provided the doctors, medical professionals, or hospitals which treated his conditions: Jefferson Family Medicine Center, St. Mary's Mental Health Center, Four Winds Hospital, Genesee Mental Health Center, St. Vincent's Hospital and Medical Center, and VA WNY Health Care System. R. 229-33. Plaintiff reported that he was currently working, but his conditions caused him to make changes in his work activities on November 24, 2003. R. 226.

In response to questioning by the ALJ, the VE testified regarding positions in the national economy for a hypothetical individual of claimant's age, education, and work experience, with the following abilities and limitations: limited to performing simple, routine and repetitive tasks in a work environment free of fast-paced production requirements and involving only simple work-related decisions and few, if any, changes in the workplace; no more than occasional interpersonal interaction with the public, co-workers and supervisors. R. 65. The VE testified that, using the Dictionary of Occupational Titles ("DOT") descriptors of physical requirements,[6] the hypothetical individual would not be able to perform Plaintiff's two most recent jobs: driving instructor, a semi-skilled, light exertional level position, and medical transport driver, a semi-skilled, medium exertional level position. However, according to the VE, the hypothetical

---

[6]The VE pointed to the absence of any physical requirements for these positions on the Work History Report Form SSA-3369 (Tr. 235-62). Tr. 63-64.

individual could perform simple, unskilled, sedentary jobs like table worker, with 464,000 jobs in the national labor market and 20,670 jobs in New York State; hands packager, an unskilled, light exertional level position with 400,000 jobs in the national economy and 21,000 jobs in New York State; cleaner/housekeeper, an unskilled, light position with 498,000 jobs in the national economy and 22,000 jobs in New York State.   The VE also testified regarding the work prospects of a hypothetical individual with the following *additional* limitations: limited to medium exertional category; with only occasional climbing ramps or stairs; precluded from climbing ladders, ropes and scaffolds, and from balancing on uneven surfaces; occasional stooping; precluded from exposure to unprotected heights and hazardous machinery.  R. 66. The VE, again, ruled out the possibility of past relevant work as a driving instructor and as a medical transport driver, but stated that the jobs described in relation to the first hypothetical, i.e., table worker, hands packager, cleaner/housekeeper, would be consistently applicable and could be performed by the hypothetical individual, even with the additional limitations of only occasional stooping, bending, kneeling, crouching, and crawling.  R. 66-67.

Nor, concluded the VE, would the hypothetical individual be able to perform any other occupations or, without difficulty, maintain a competitive job eight hours a day five days a week, due to panic attacks, passing-out behavior, physical limitations of the right knee and ankle, significant bipolar disorder, very high manic episodes and, at times, depression with trouble getting out of bed.  Tr. 67-68.  Upon examination by Plaintiff's representative regarding Plaintiff's highest earnings of $9,000.00 in 2009, the VE acknowledged that he did not have the SGA records for review, but testified that if, in the second hypothetical, the individual described by the ALJ had even more additional limitations, including being off task 20 per cent of the time during an eight-hour work day, or missing three days per month due to impairments or treatment,

such individual could not perform, on a regular and continuous basis, any past relevant work or any other competitive work in the labor market.  R. 68-69.

## C.   Medical Evidence

Review of medical records from St. Vincent's Hospital-Westchester (1999) and Four Winds Hospital (2000) reveals that Plaintiff was treated for mental health issues as a teenager when he threatened his parents, and engaged in homicidal ideation about his teacher and peers at his NYC school.  R. 299-319.  During his hospitalization in 1999, Plaintiff gave no indication of having psychotic symptoms; his problems appeared to be strictly oppositionality and defiance; a physical exam showed no abnormalities; and he was referred back to his therapist and prescribed Depakote and Zyprexa.   R. 304-305.   Medical records from Plaintiff's hospitalization in 2000 showed that he experienced psychotic symptoms because of not taking prescribed medications due to his family's inability to afford them.  R. 316.  The treatment plan focused on assistance with medication compliance.  *Id.*

A discharge summary from St. Mary's Mental Health Center, dated November 13, 2006, shows that Plaintiff self-referred in May of 2006 complaining about being depressed and requesting assistance with mood regulation.  R. 322.  Plaintiff reported using marijuana daily to "calm [his] mood," and drinking alcohol daily.  R. 323, 328.  He also described a history of psychiatric problems, with inpatient treatment at ages 14 and 15, and a discharge from the Army Special Forces with a diagnosis of bipolar disorder.  R. 323, 325.  The treatment plan included a psychiatric evaluation, determination of the need for medication for psychiatric intervention, and coordination with his drug treatment program.  R. 329-30.  The discharge summary stated that the psychiatric evaluation was performed on July 11, 2006, Trazodone for sleepwalking was continued, and Celexa was prescribed for depression.  R. 330-33.  The evaluator opined that Plaintiff's problems were more consistent with emotional dysregulation and personality

9

disorder than bipolar disorder; stated that these problems met the criteria for major depression; and referred him to the Partial Hospitalization Program. R. 332. The discharge summary also stated that Plaintiff showed poor attendance at scheduled sessions, though depression without overt risk was noted; was lost to contact despite attempts to re-engage him in treatment; and his prescriptions for Trazodone and Celexa would have run out in September. R. 334. The final primary diagnosis was Mood Disorder, NOS. *Id.*

Based on a referral appointment from the Partial Hospitalization Program at Rochester General Hospital, to which he had been linked but refused services, Plaintiff was seen at Genesee Mental Health Center ("GMHC") on February 13, 2009, and during a one-hour Pre-Admission Screen, social worker Tricia Wyjad, LMSW, noted that Plaintiff's chart at the GMHC's Continuing Day Treatment Program had recently been closed due to noncompliance and continued drug use and that Plaintiff reported the following issues: marital problems; a history of PTSD; a history of child abuse; two years of military service with stationing in Baghdad for four months during which he was hit by an IED leading to discharge[7]; panic attacks causing his heart to race; abdominal and chest pain; a suicide attempt on February 6, 2009 involving an overdose of Lyrica and possibly Lithium and brandy, wrist cutting, and passing out for which he was thrice mental hygiene arrested, but sneaked out of Strong Hospital. R. 336-37. Ms. Wyjad noted that Plaintiff seemed to be a "poor historian" and "very vague on providing details" regarding these and past events. R. 337.

Plaintiff reported a heart condition, epilepsy, and seizures for 10 years; success with Lithium in mood stabilization; daily marijuana use, but not willing to engage in inpatient substance abuse treatment; alcohol use which increased his anger and agitation and in the past interfered with Lithium's effectiveness in regulating his moods. R. 337-38. On the mental

---

[7] Ms. Wyjad noted a discrepancy in that Plaintiff's past records conflicted with this account because past records showed that Plaintiff completed the physical for basic training but was not accepted due to a heart condition. R. 366.

status examination, Ms. Wyjad observed Plaintiff's spontaneous speech; organized thought process with some reported racing thoughts; goal-directed thought content with negative ruminating thoughts and possible delusional thinking; depressed and anxious mood; congruent affect; orientation times three; intact recent and remote memories; poor insight and judgment; good impulse control and concentration. R. 338. Notwithstanding Plaintiff's reported history of suicide attempts, Ms. Wyjad assessed Plaintiff as safe to remain in the community at the current level of care. *Id.* She diagnosed Plaintiff with "Depressive Disorder NOS; Bipolar Disorder Unspecified; Posttraumatic Stress Disorder; Alcohol Dependence; Cannabis Dependence" on Axis I,[8] and assessed a Current Global Assessment of Functioning (GAF)[9] score of 50. Ms. Wyjad referred Plaintiff to William Knothe, LCSW-R, Adult Therapist at GMHC. R. 339.

Outpatient Clinic Progress Notes indicate that Mr. Knothe saw Plaintiff at an appointment on March 9, 2009, at which time Plaintiff had good eye contact, spontaneous speech, organized thought process, goal-directed thought content, full range mood, congruent affect, orientation times three, intact recent and remote memory, good insight, judgment, impulse control, concentration, and no suicidal/homicidal ideation. R. 340. Plaintiff stated that he would be starting a full-time job at the Morgan School of Driving the next day and was not sure of his availability for appointments. *Id.* Progress Notes dated March 24, 2009 indicate that Plaintiff canceled the scheduled appointment on this date. R. 341.

On May 17, 2010, Dr. Harbinder Toor, M.D., of Industrial Medicine Associates, P.C., performed a consultative physical examination of Plaintiff. Tr. 366-70. Plaintiff's chief

---

[8] Citing the *Diagnostic and Statistical Manual of Mental Disorders-IV-TR*, Front Matter, Multiaxial Assessment (2000 ed.) ("DSM-IV"), Defendant, at footnote 2, states that on the multiaxial scale assessing an individual's mental and physical on five axes, Axis I refers to clinical disorders and Axis V refers to the individual's global assessment of functioning. ECF No. 11-1.

[9] Citing DSM-IV, Defendant, at footnote 3, states: "A GAF in the range of 41 to 50 signifies serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." ECF No. 11-1.

complaints included a history of pain in his right knee and right ankle due to injury in 2003; seizures since 1985, the last was at age nine; passing out, the last time was in 2005; asthma since 1985, without hospitalization or emergency room visits for attacks, but made worse by dust and pollen; heart murmur, but no recent chest pain, except for a few weeks ago which went away on its own; hypertension since 2000; and hypoglycemia since 2003. R. 366. Plaintiff reported being past hospitalized for "psychology" twice in 1999 and once in 2000, but no history of heart attack, emphysema, or diabetes. R. 366-67. Current medications consisted of Celebrex, Albuterol, and Advair. R. 367. A smoker since 2001, Plaintiff reported smoking a pack a day, as well as currently using marijuana, having started in 1999. *Id.* Also, Plaintiff reported drinking beer since 2001, and still using alcohol. *Id.*

His reported activities of daily living included cooking twice a week, showering three days (no bathing), dressing daily, watching TV, and performing childcare daily. *Id.* Plaintiff reported that he lived with his wife, did no cleaning, laundry, or shopping, did not listen to the radio, go out, read, engage in sports, or socialize, and had no hobbies. *Id.* Upon conducting a physical examination, Dr. Toor noted that Plaintiff was 5'5," weighed 213 pounds, and appeared to be in no acute distress. *Id.* Upon taking a blood pressure reading, Dr. Toor advised Plaintiff to follow up with his primary care physician regarding non-symptomatic high blood pressure, also noting a pulse rate of 76 beats/minute and respiration at 18/minute. *Id.* His vision was slightly decreased with 20/70 in the right eye and 20/50 in the left eye, with both eyes 20/50 on the Snellen chart at 20 feet. *Id.* Plaintiff's gait slightly limped toward the right side, could walk on his heels and toes with difficulty, squat 50% of full with pain in the right knee. *Id.* Plaintiff could stand normally, used no assistive devices, needed no help changing for the examination, but had slight difficulty getting on and off the examination table because of right knee and ankle pain, although he was able to rise from a chair without difficulty. *Id.* The doctor noted no skin

12

(except right knee scar), head, face, ears, nose, throat, neck, chest and lung, or abdominal abnormalities, and heard no heart murmur on auscultation. R. 368. Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally, with no evidence of scoliosis, kyphosis, or abnormality in the thoracic spine. *Id.* The lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. *Id.* Plaintiff had the full range of motion in his shoulders, elbows, forearms, left knee, left ankle, wrists bilaterally, and hips bilaterally. *Id.* Dr. Toor noted full movement in the right ankle with slight pain and pain in the right knee with flexion and extension 145 degrees, with evidence of an old injury, and scar from surgery. *Id.* There were no evident subluxations, contractures, ankylosis, or thickening; his joints were stable and nontender, with no redness, heat, swelling, or effusion. *Id.*

Neurologically, Plaintiff had no sensory deficit; his deep tendon reflexes were physiologic and equal in the upper and lower extremities, and strength in upper and lower extremities was 5/5. R. 369. His extremities showed no cyanosis, clubbing or edema, or significant varicosities or trophic changes, and his pulses physiologic and equal. *Id.* Plaintiff's hand and finger dexterity was intact and his grip strength was 5/5 bilaterally. *Id.* Dr. Toor opined that Plaintiff's prognosis was fair and assessed Plaintiff as having moderate limitations standing, walking, squatting, and lifting because of right knee and right ankle pain due to injury. *Id.* Dr. Toor stated that Plaintiff should avoid heavy exertion, irritants/factors which exacerbate asthma, heights and operating machinery because of a history of passing out and seizures, but noted that his evaluation suggested no other medical limitations. *Id.*

Kavitha Finnity, Ph.D., a licensed psychologist, conducted a consultative psychiatric evaluation of Plaintiff on May 17, 2010. R. 371-74. Plaintiff provided background information which included that he was married and lived with his wife and 1-year-old child; had a high

school diploma and an Associate's degree in aircraft operations; had been in special education classes; was currently employed as a driving instructor working 10-20 hours per week and had been working since 2008; and was previously employed in medical transportation, retail management, and delivery. R. 371.

Dr. Finnity noted that Plaintiff was not currently in treatment, but between 1999 and 2001 had been seen at Jewish Community Hospital, and between 2001-2002 he was seen for psychotherapy at Westchester Psychiatric Hospital. *Id.* Plaintiff had been hospitalized for delusional thoughts in 1999, once at St. Vincent's Hospital for 38 days and, again, for 45 days at Four Winds Hospital; and in 2001, he was hospitalized for three months for suicidal ideation at Four Winds Hospital. *Id.* Plaintiff reported that he had seizures from 1985-1998, had been hospitalized for knee surgery, and currently suffered from asthma, heart arrhythmia, heart murmur, high blood pressure, and diabetes. *Id.* He reported current functioning which involved difficulty sleeping; loss of appetite; depressive symptoms of dysphoric mood, hopelessness, loss of interest, loss of energy, and social withdrawal; manic symptoms of pressured speech, psychomotor agitation, decreased need for sleep, and increased goal directed activity; increased anger; visual hallucinations; feelings of paranoia; and difficulty with short-term memory, concentration, and organization. R. 371-72. Plaintiff also informed Dr. Finnity that he had a problem with alcohol, but stopped drinking six months ago, and indicated that he used marijuana on a daily basis. R. 372. He also recounted a family history significant for alcoholism and mental illness. *Id.* Plaintiff entered the United States Army in 2002, but was medically discharged in 2003. *Id.*

During the mental status examination, Dr. Finnity observed that Plaintiff, who appeared to be his stated age, was cooperative and socially appropriate. *Id.* Plaintiff was appropriately dressed and well groomed, with normal gait, posture, motor behavior, and appropriate eye

contact. *Id.* Plaintiff's speech was fluent, voice quality was clear, both expressive and receptive language skills were adequate, and his thought processes were coherent and goal-directed. *Id.* He expressed a full range of affect appropriate in speech and thought content and his mood was neutral. *Id.* He was oriented to person, place, and time; his attention and concentration, as evidenced by doing serial 3s with one mistake, were intact. *Id.* Dr. Finnity also determined that Plaintiff's recent and remote memory skills were impaired based on his recalling three out of three objects immediately, one out of three objects after five minutes, and remembering zero digits forward and zero digits backwards. R. 373. Regarding Plaintiff's cognitive functioning, Dr. Finnity estimated that he was of average functioning, his general fund of information was appropriate to his experience, and his insight and judgment were fair. *Id.*

Regarding daily activities, Dr. Finnity determined that Plaintiff could dress, bathe, and groom himself; cook and drive; socialize with friends; get along well with immediate family; had no hobbies; and spent his days working and watching TV. *Id.* Consequently, Dr. Finnity opined that Plaintiff could follow and understand simple directions and perform simple tasks, as he had difficulty with attention and concentration; he could maintain a regular schedule, learn new tasks, perform complex tasks, and make appropriate decisions; but had difficulty relating to others and dealing with stress. *Id.* Moreover, Dr. Finnity found her evaluation results consistent with Plaintiff's allegations. *Id.* Her diagnosis reflected that Plaintiff suffered from mood disorder, psychotic disorder, alcohol abuse in sustained remission, marijuana abuse, high blood pressure, heart disease, diabetes, history of seizures and asthma. *Id.* She recommended that Plaintiff seek psychological and psychiatric treatment, finally noting that his prognosis was fair, and he would require assistance to manage his funds. *Id.*

On May 25, 2010, state agency psychological consultant Dr. L. Meade used the Psychiatric Review Technique to assess Plaintiff's schizophrenic, paranoid and other psychotic

disorders (12.03), affective disorders (12.04), and substance addiction disorders (12.09), and determined that the medically determinable impairments of psychotic disorder, mood disorder, and marijuana abuse disorder did not precisely satisfy the pertinent listing criteria. R. 348-57. Moreover, Dr. Meade assessed no functional restriction of daily living activities or maintaining social functioning, but found moderate difficulties in maintaining concentration, persistence or pace, and insufficient evidence to assess whether there were repeated episodes of deterioration each of extended duration. R. 358.

From the Mental Residual Functional Capacity Assessment conducted on the same date, Dr. Meade concluded that in the area of understanding and memory, Plaintiff was not significantly limited in his abilities to remember locations and work-like procedures or to understand and remember very short and simple instructions, although he was moderately limited in this ability to understand and remember detailed instructions. R. 362. In the area of sustained concentration and persistence, Plaintiff was not significantly limited in his abilities to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, or make simple work-related decisions. R. 362-63. According to Dr. Meade, in this area, Plaintiff did have moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. R. 363. Otherwise, in the areas of social functioning and adaptation, Dr. Meade detected no significant limitations. *Id.* Additionally, considering Plaintiff's several past hospitalizations for psych and drug and alcohol abuse, that he was currently not in treatment or on medications, that he

managed to work a part-time job with reported symptoms of depressed mood, social withdrawal, poor sleep and appetite, loss of energy, and past episodes at times of manic symptoms, though not currently, Dr. Meade opined that Plaintiff was capable of simple task work. R. 364.

On June 4, 2010, primary care physician Dr. Mark A. Brown, Jefferson Family Medicine Center, completed a questionnaire to assist with adjudication of Plaintiff's disability claim. Dr. Brown stated that he had seen Plaintiff for only two visits, but Plaintiff was "not willing to undergo a Psych Eval & this is his major area of disability." R. 376-77. Dr. Brown noted his expectation that Plaintiff's condition would last a lifetime and, further, that Plaintiff was currently depressed. R. 377-78. He also opined, based upon the absence of any limitations to lifting and carrying, standing and/or walking, sitting, pushing and/or pulling, or other postural, manipulative, visual, communicative, or environmental limitation, Plaintiff had no limitations to doing work-related physical activities. R. 379. Ultimately, in Dr. Brown's opinion, Plaintiff had no limitations to working, but stated his belief that Plaintiff had significant "pysch/mh issues" which needed to be evaluated by mental health professionals to determine the level of disability. R. 380.

On September 27, 2010, Plaintiff saw Dr. Andrew McGarry, neurologist at the URMC's Neurology – Westfall, for a question of alteration in consciousness, at the request of Dr. Mark A. Brown. R. 385-386. Plaintiff reported a medical history which included bipolar disorder, asthma, groin folliculitis, SVT, and epilepsy. R. 385. He told Dr. McGarry that he had seizures until age nine, and although he had taken various medications for bipolar disorder over the years, he had not been on anything for several months. *Id.* He also informed Dr. McGarry that in 2003, while deployed for the Army in Baghdad, he lost consciousness and, while on the ground, sustained a gunshot wound to this right knee region with injury to his ACL. *Id.* Since 2003/2004, Plaintiff explained, every several months, he experienced loss of consciousness, with

the most recent occasion occurring three months ago which was witnessed by his wife. *Id.* He reported currently working two jobs, one as a driving instructor and the other as security in a factory. *Id.* Additionally, Plaintiff acknowledged a history of AA and NA, but had not used alcohol, cocaine, opiates, or MDMA (ecstasy) three years, although he smoked marijuana daily. *Id.* Dr. McGarry noted that upon a physical examination, Plaintiff was well nourished, well-developed and in no apparent distress, and Plaintiff's mental status showed that he was alert and oriented times three, with no speech or language deficits, and with appropriate mood and affect, though notably anxious.   Cranial nerves, motor, sensation, gait, and reflexes also appeared normal, Dr. McGarry observed. R. 386. As a result of his impressions, Dr. McGarry ordered an MRI and EEG, with follow up within two to three  months; wrote a note to Plaintiff's employer to keep him off the road until things got sorted out; advised Plaintiff, for the time being, against driving in the setting of alterations of consciousness; discussed NYS driving laws regarding seizures and driving; cautioned Plaintiff to avoid flames, heights, machinery, and bodies of water; and noted Plaintiff's conveyed understanding of these concerns. *Id.*

From April 8, 2011 through July 5, 2011, Plaintiff was seen at the Outpatient Clinic at EBMHC, with a comprehensive mental health evaluation performed on April 8, 2011 by social worker Emily L. Stanton, MSW, and participation in individual therapy sessions with clinical social worker Noel Calvo, LCSW on April 26, 2011, May 12, 2011, and July 5, 2011, to address behavioral, employment, family, and legal problems, and substance abuse issues. R. 387-416. During the mental health evaluation, Plaintiff reported the following: a bipolar disorder with manic episodes since a teen; recreational practices which included strip clubs, using the computer, watching TV, and trying to relax; psychiatric admissions in New York City at ages 11 and 13; a history of several suicide attempts; weekly alcohol use and synthetic marijuana (K4) use, with his last use of marijuana two months ago, but no alcohol problem; possession of an

Associate's degree; Army service for two years, but received a medical discharge due to injury; anger and depression which played roles in jumping from job to job; a high sex drive, testing the limits with other women, often visiting porn stores and strip clubs for entertainment; current legal problems due to an altercation with a tow truck driver; marital issues involving beating his wife; a history of physical abuse and involvement in risky behaviors for excitement. R. 387-388. Plaintiff also reported Dr. Mark Brown as his primary care physician, and a history of diabetes, high blood pressure, asthma, and alcohol and drug abuse. R. 392. Ms. Stanton diagnosed Plaintiff with cannabis abuse, Bipolar I disorder, current or most recent episode major depressive, severe with psychotic features, and ruled out Bipolar II disorder (recurrent major episodes with hypomanic episodes). R. 399.

EBMHC case notes reflect that on April 26, 2011, LCSW Calvo confirmed Ms. Stanton's diagnoses. R. 399, 404. At this appointment, Plaintiff discussed a history of bipolar disorder, CD treatment that he never completed, as well as seeming symptoms of PTSD, and tearfully told Ms. Calvo that while serving in the Army in Iraq, he, the staff sergeant, was the only survivor of an attack. R. 399. Plaintiff stated that he served in Iraq for four months, but never received treatment and continues to have flashbacks. R. 399-400. He said he was not interested in pharmacotherapy, *i.e.*, medications, but described the following issues: anger ("needing to be stopped"); restraining order initiated by his wife; blackouts; depression; aggressiveness ("wolverine"); violence and assaultive behavior; marijuana abuse and alcohol abuse ("a few beers every night at the bar"); and difficult-to-manage mania which involved taking risks, not asking for help at work, thinking he could "take on" several guys at once, going into a fire. R. 400. Though contacting Strong Memorial Hospital or Rochester General Hospital, Ms. Calvo could find no evidence in their medical records regarding Plaintiff's reported Lithium overdose in a suicide attempt. R. 402.

At the session on May 12, 2011, Ms. Calvo again confirmed Ms. Stanton's diagnoses but added "Rule out Posttraumatic Stress Disorder."  Plaintiff described his current work as a driving instructor, bouncer, and security guard, and reported that he got a "rush" out of fighting, so he enjoyed his job as a security guard, also mentioning that he could "take on" two to three people at once.  R. 400, 404-05.  He discussed his problems with his wife, stating that he went to bars and ended up at the home of a female other than his wife.  R. 404.  Ms. Calvo described Plaintiff as stable, with antisocial personality traits, but having no verbalized current ideation or intent to be violent.  R. 405.  She also made note of the enjoyment Plaintiff derived from testing his boundaries and limits and excitement from engaging in risky behaviors such as running red lights.  R. 406.

Ms. Calvo met with Plaintiff again on June 14, 2011, and encouraged him to cut back on cannabis use and to consider medications for mood stabilization.  R. 409.  Plaintiff stated his fear of going back on medications, reporting that they made him feel sleepy, "drugged up" and he became violent, although acknowledging the violence may have been a response to several serious stressors.  *Id.*  According to Ms. Calvo, Plaintiff presented as stable during the session, but displayed mood instability, financial, marital, and interpersonal stress; and, by his report, seemed to be entering a hypomanic episode.  *Id.*

At the therapy session with Plaintiff on July 5, 2011, Ms. Calvo described Plaintiff as stable, with reports of feeling depressed and overwhelmed, but open to processing issues, applying cognitive behavioral therapy.  R. 413.  A mental health treatment plan was put into place to address Plaintiff's history of mania and issues related to war trauma and included a goal of consideration of the benefits of pharmacotherapy, and as appropriate, referral to a psychiatrist. R. 415.

On June 6, 2011, Dr. Mark A. Brown, Jefferson Family Medicine Center, completed a Medical Source Statement wherein he stated that he had contact with Plaintiff, diagnosed as having "SVT,[10] HTN,[11] Epilepsy c Abnl EEG,[12] Bipolar disorder," for a year, with contact every 8-9 weeks. R. 381-384. Discussing the extent to which these impairments impacted Plaintiff's functional limitations in a competitive work environment, Dr. Brown stated that Plaintiff could walk several city blocks without rest or severe pain; could sit for more than 2 hours without needing to get up; could stand for more than 2 hours without needing to sit down; with normal breaks, could sit or stand/walk for at least 6 hours in an 8-hour workday; did not need a job permitting shifting positions at will; did not need to take unscheduled breaks during an 8-hour workday; could frequently grasp, turn and twist objects with his hands, perform fine manipulations with his fingers and reach overheard with both arms. R. 381-82.

Regarding the 16 mental abilities and aptitudes needed to do unskilled work, Dr. Brown rated Plaintiff as limited but satisfactory in 10 categories, stating that he could: remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; maintain regular attendance and be punctual within customary, usually strict tolerance; sustain an ordinary routine without special supervision; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and deal with normal work stress. R. 383. However, Dr. Brown stated that due to Bipolar disorder, Plaintiff could have behavioral extremes which seriously limited, but did not preclude functioning in the remaining six categories: maintain attention for a two hour segment; work in coordination with or proximity to others without being

---

[10] Stedman's Medical Dictionary 1872, 1931 (28th ed. 2006): abbreviation for supraventricular tachycardia (rapid heartbeat above the ventricles).
[11] Stedman's Medical Dictionary 927 (28th ed. 2006): abbreviation for hypertension (high blood pressure).
[12] Stedman's Medical Dictionary 613 (28th ed.2006): abbreviation for electroencephalogram.

unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; and be aware of normal hazards and take appropriate precautions. *Id.* Dr. Brown listed no category in which Plaintiff would be unable to meet competitive standards or had no useful ability to function. *Id.* However, in Dr. Brown's opinion, based upon Plaintiff's impairments and work-related limitations, he would be off task for 20% of an 8-hour work day, have good and bad days, and likely be absent from work about three days per month. *Id.* Furthermore, Dr. Brown noted that Plaintiff had blackouts related to a seizure disorder which would affect his ability to work at a regular job on a sustained basis. R. 384.

## III.   DISCUSSION

### A.  Scope of Review

On appeal, this Court's role is to determine "if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see also* Title 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."). It is not this Court's function to "determine *de novo* whether the [plaintiff] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (citation omitted). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Burgess v. Astrue*, 537 F.3d 117, 127-128 (2d Cir. 2008) (citing *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## B.   Fed. R. Civ. P. 12(c) Standard

Rule 12(c) permits a party to move for judgment on the pleadings "after the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Thus, in deciding a Rule 12(c) motion, a court employs the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam). A court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Id.* To withstand a motion for judgment on the pleadings, a court must determine whether the "'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* at 161 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Thus, granting judgment on the pleadings is only appropriate when, after reviewing the record, the court is convinced that the plaintiff has failed to set forth a plausible claim for the requested relief based on the evidence presented. *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## C.   Standard for Eligibility for DIB and SSI

The SSA provides that for purposes of both SSI and DIB eligibility, an individual shall be considered disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only upon a demonstration that his or her physical impairment(s) are of such severity as to preclude him or her from not only performing his or her previous work but, considering his or her age, education, and work experience, from engaging in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

In determining whether an individual is disabled, using this definition, the Commissioner must engage in the SSA-created five-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1520(a) and 416.920(a).  The Commissioner must consider, in order: (1) the individual's work activity (20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i)); (2) the medical severity of the impairment(s) and that it meets the duration requirement in §§ 404.1509 and 416.909 (20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii)); (3) the medical severity of the impairment(s) and that it meets or equals the listings criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)); (4) an assessment of the individual's residual functional capacity and past relevant work history (20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv)); and (5) an assessment of the individual's residual functional capacity and age, education, and work experience to see whether he or she can make an adjustment to any other type of work (20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v)).

The required analysis is as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work.  Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).   The claimant bears the general burden of proving that he or she has a disability at steps one through four of the sequential five-step process, *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), and only when the claimant proves that he or she cannot return to his or her prior work, at step five, does the burden shift to the Commissioner to prove the existence of alternative substantial gainful work in significant numbers in the national economy which claimant can perform, considering his or her physical and mental capabilities, age, education, experience and training.   *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

### D.   The ALJ's Decision

The ALJ followed the sequential five-step analysis for evaluating Plaintiff's claim of disability.   R. 17-24.   At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 21, 2008, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq* and 416.971 *et seq*).   R. 17.   At step two, he found that Plaintiff had the following severe impairments: marijuana and alcohol abuse, obesity, blackouts by history, bipolar disorder, and hypertension.   20 C.F.R. §§ 404.1520(c) and 416.920(c).   R. 18.   At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).   *Id.*

The ALJ, after careful consideration of the record consisting of the medical evidence, other evidence, and Plaintiff's subjective complaints, and affording Plaintiff the benefit of any reasonable doubt, at step four, concluded that Plaintiff had the residual functional capacity to perform a range of medium work[13] with restrictions of no more than occasional climbing of

---

[13] As defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.   If someone can do medium work, we determine that he or she can also do sedentary and light work."

ramps and stairs, stooping, kneeling, crouching, or crawling; preclusion from balancing on uneven surfaces and from climbing ladders, ropes, or scaffolds; directive to avoid all exposure to unprotected heights and hazardous machinery; and limitations to only simple routine and repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions and few if any work place changes, and requiring no more than occasional interaction with the public, co-workers, or supervisors. R. 19. Also, at step four, the ALJ found that Plaintiff was unable to perform any past relevant work. R. 23. Considering Plaintiff's age, education, work experience, and residual functional capacity, at step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform; specifically, table worker, hand packager and cleaner/housekeeper. R. 24. Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined in the SSA, since June 21, 2008, the alleged disability onset date (20 C.F.R. §§ 404.1520(g) and 416.920(g)). Based on the application for disability insurance benefits filed on November 18, 2009, and the application for supplemental security income filed on March 11, 2010, he concluded that Plaintiff was not disabled under §§ 216(i), 223(d), and 1614(a)(3)(A) of the SSA. R. 24.

**E.   The Commissioner Applied the Correct Legal Standards**

Upon review and as discussed herein below, there is nothing to support any contention that the Commissioner failed to apply the correct legal standard. There is no doubt that the Commissioner applied the correct legal standards by engaging in the SSA-created five-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1520 and 416.920.

**F.   Substantial Evidence Supported the Commissioner's Decision**

I find that the ALJ based his decision that the Plaintiff was not disabled upon a record which contained substantial evidence to support the decision. The ALJ clearly reviewed and

considered all available evidence in reaching his decision. In so doing, at step one he found that Plaintiff had not engaged in substantial gainful activity since June 21, 2008, the alleged disability onset date (20 C.F.R. §§ 404.1571 *et seq* and 416.971 *et seq*). R. 17. The ALJ found that Plaintiff had worked after the alleged disability onset date, and was currently working part-time as a driving instructor and had worked three part-time jobs simultaneously in 2011, but that this work activity did not rise to the level of substantial gainful activity. *Id.* At step two, he found that Plaintiff had the following severe impairments: marijuana and alcohol abuse, obesity, blackouts by history, bipolar disorder, and hypertension. 20 C.F.R. §§ 404.1520(c) and 416.920(c). R. 18. This severe combination of impairments, according to the ALJ, caused more than minimal limitation in the Plaintiff's ability to perform basic work activities and was expected to last more than 12 continuous months. *Id.*

In determining at step three that Plaintiff's severe mental impairments, singly or in combination, did not meet or medically equal the criteria of listing 11.02, 11.03, 12.02, 12.03, 12.04, 12.08, and 12.09, the ALJ evaluated them according to the criteria set forth in "paragraphs B and C." *Id.* As the ALJ acknowledged, "paragraph B" required that the mental impairment must result in two of the following: marked restriction of daily living activities; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ noted that "marked limitation" means "more than moderate but less than extreme," and "repeated episodes of decompensation, each of extended duration" means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* The ALJ described the criteria in "paragraph C" as requiring the following: repeated episodes of decompensation, potential episodes of decompensation based on a minimal increase in mental demands, or the inability to function outside a highly supportive living arrangement. R. 19.

Using these criteria to evaluate the record regarding Plaintiff's mental impairments, the ALJ considered that Plaintiff had mild restriction in daily living activities, mild difficulties in social functioning, and moderate difficulties regarding concentration, persistence or pace. R. 18. He concluded that the criteria in "paragraph B" had not been satisfied because the medical evidence reflected no episodes of decompensation which had been of extended duration, and no episodes in which Plaintiff suffered increased symptoms with loss of adaptive functioning lasting two weeks or more. R. 19. He also determined that the criteria under "paragraph C," had not been satisfied either because the evidence failed to establish repeated episodes of decompensation, potential episodes of decompensation based on a minimal increase in mental demands, or the inability to function outside a highly supportive living arrangement. *Id.*

The ALJ, next, undertook a Residual Functional Capacity ("RFC") assessment pursuant to SSR 96-8p, which reflected the degree of limitation found in the "paragraph B" mental function analysis, taking care to note that the limitations identified in "paragraph B" were used to rate the severity of Plaintiff's mental impairments at steps two and three. *Id.* Analyzing the entire record, the ALJ ultimately determined that Plaintiff had an RFC to perform a range of medium work, but with restrictions of no more than occasional climbing of ramps and stairs, stooping, kneeling, crouching, or crawling; preclusion from balancing on uneven surfaces and from climbing ladders, ropes, or scaffolds; directive to avoid all exposure to unprotected heights and hazardous machinery; and limitations to only simple routine and repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions and few if any work place changes and requiring no more than occasional interaction with the public, co-workers, or supervisors. *Id.*

In making this RFC determination, the ALJ considered all of Plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical

and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p. *Id.* He also considered the opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. *Id.*

Social Security regulations require Administrative Law Judges to follow a two-step process for evaluating pain and other limiting effects of symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(c)(3). First, the ALJ must determine whether the objective medical evidence, *i.e.*, medical signs, laboratory findings, and other evidence, shows that a claimant suffers from a medically determinable impairment which could reasonably be expected to produce the claimant's symptoms. If the claimant does suffer from an impairment, the ALJ must then evaluate the intensity, persistence, or limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to work. 20 C.F.R. § 416.929(c)(1). When doing do, the ALJ must consider all of the available evidence, including the claimant's medical history, medical signs, and laboratory findings, and statements from the claimant, the claimant's treating source and other medical opinions, or other persons about how the symptoms affect the claimant. *Id.*

If a claimant's statements about his or her symptoms are not supported by the objective medical evidence, *i.e.*, suggest a higher level of severity than shown by the medical evidence, the ALJ must consider the other evidence and make a credibility assessment based upon the following factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment to relieve symptoms; (6) any measures taken by claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R.

§§ 404.1529(c)(3), 416.929(c)(3).  The ALJ's decision must set forth "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the [claimant] and to any subsequent reviewers the weight the [ALJ] gave to the [claimant's] statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  No grounds for remand exist where "the evidence of record permits [a court] to glean the rationale for the ALJ's decision."  *Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983).

The ALJ, first, reviewed Plaintiff's testimony regarding those issues which caused his alleged inability to engage in competitive employment: history of blackouts and seizures, with ongoing blackouts two to three times each week and ongoing micro-seizures; difficulty with depressed and manic moods, including at times, not caring about anything and inability to get out of bed, while at other times striving to outperform others with no regard for safety; problems with his knee dislocating and pain in his ankle; ongoing asthma attacks, chest tightness, back pain and headaches.  Upon considering all of the evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause certain of the alleged symptoms.  R. 20.

However, as his review of the record reveals, the ALJ found Plaintiff's statements concerning the intensity, persistence, or limiting effects of these symptoms not to be credible to the extent they were inconsistent with the RFC assessment.  *Id.*  Regarding alleged mental health issues, the ALJ took into account Plaintiff's diagnosed bipolar disorder and his long history of psychiatric treatment starting with threatening his parents in 1999 and hospital admittance in 2000 with homicidal ideation toward his classmates and teacher, the latter incident appearing to be an exacerbation of psychotic symptoms due to going off medication the previous month.  *Id.*  The ALJ noted a gap in treatment based upon the lack of any further mental health treatment

records until 2006 when Plaintiff self-referred to St. Mary's Mental Health Center for depression and was placed in chemical dependency treatment, having admitted to alcohol and marijuana use. *Id.* The ALJ referred to treatment records which showed (1) that Plaintiff's attendance was poor and he was eventually lost to contact; (2) he restarted treatment in February 2009 after a reported recent suicide attempt not seen in the record – he was observed to be a very poor historian; and (3) again, was lost to contact after one follow up visit. *Id.*

In determining that Plaintiff's work should be limited to simple, routine, and repetitive tasks with no more than occasional social interaction, the ALJ, additionally, considered the following: Plaintiff's reported success stabilizing his mood with Lithium, but acknowledged failure to take his medication for some two months; his admitted use of alcohol which increased his anger and agitation; the lack of psychiatric treatment since 2002 as reported during a consultative examination in 2010 which showed somewhat impaired memory as his only deficit; mental health reports since April 2011 which reflected normal or essentially normal findings on mental status examinations; Plaintiff's either non-compliance with or refusal to take medication; and treatment notes which consistently labeled Plaintiff's condition as stable. R. 20-21.

The ALJ also considered Plaintiff's on-going struggles with marijuana and alcohol abuse in evaluating his current functioning for purposes arriving at the RFC. Most particularly, consideration was given to the fact that the evidence in the record demonstrated Plaintiff's continued use of marijuana and alcohol through the date of the hearing, with reports of use as early as in 1999 during his first psychiatric treatment, in 2006 during his admission for depression, and in 2009 when he refused inpatient chemical dependency treatment, stating that drug and alcohol use was not an issue, despite alcohol's negative impact on his anger and agitation. R. 21.

Plaintiff's reported history of blackouts was not overlooked in arriving at the environmental limitations of this assessment. The ALJ found in the treatment records evidence of only Plaintiff's self-reports of seizures and blackouts, noting that Plaintiff told Dr. Toor during a consultative examination in May of 2010, that his seizures stopped at age nine and that his last blackout occurred in 2005, but just a few months later, in September 2010, he told neurologist Dr. McGarry that he experienced a loss of consciousness every several months since 2003-04 and testified during the hearing that he experienced blackouts two to three times each week. *Id.* The ALJ found it significant that Plaintiff continued to work as a driving instructor while allegedly experiencing these blackouts. *Id.*

The ALJ found evidence of Plaintiff's diagnosed hypertension and obesity in the record. *Id.* Furthermore, he considered the effect of Plaintiff's hypertension on his exertional capacity, and assessed the impact of weight in the obese range, in combination with the other impairments, in arriving at postural limitations reflected in the RFC. *Id.*

According to the ALJ, several factors damaged Plaintiff's credibility as to the severity of his allegedly disabling impairments, namely: (1) a pattern of noncompliance with medical recommendations, including poor attendance, lack of follow-up with mental health and substance abuse treatments, and unwillingness to undergo psychological evaluations; (2) Plaintiff's continued work as a driving instructor up to the time of the hearing after being advised by Dr. McGarry, neurologist, not to drive; (3) Plaintiff's engaging in substantial work activity for a number of periods since the alleged onset date, i.e., simultaneously working three part-time jobs during 2011 and frequently working on double shifts. *Id.*

Significantly, the ALJ pointed to a host of inconsistencies in the record also detracting from Plaintiff's credibility: differing statements regarding socializing and alcohol use on the same day, May 17, 2011, to two different consultative examiners — did not socialize and was

still using alcohol versus socialized with family and friends and stopped using alcohol six months ago; a report to Dr. McGarry in September 2010 that he had not imbibed alcohol for three years, as compared with more recent reports in the medical records of EBMHC detailing daily alcohol consumption and continued smoking pot on a daily basis; contrasting statements to Drs. Toor and McGarry, four months apart, regarding the history and frequency of blackouts — in May 2010, last blackout in 2005, versus in September 2010, experienced blackouts every several months since 2003-04; reports in February of 2009 of a 10-year history of seizures, but in May 2010, Plaintiff's report that seizures stopped at age nine; multiple conflicting claims regarding injuries purportedly received during military service — injuries from a gunshot wound in Iraq, or from being hit by an improvised explosive device in Iraq, resulting in discharge, or discharged from the military due to a myocardial infarction suffered after three months in basic training, or was the only survivor of an attack in Iraq causing "flashbacks" all the time, or even record indications that Plaintiff had never joined the military.   R. 22.

It is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of the witnesses," including the claimant.   *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).   Based upon the specific reasons offered by the ALJ for his finding on credibility and the wealth of supportive evidence in the record, I conclude that the ALJ ably resolved the evidentiary conflicts and reasonably appraised Plaintiff's credibility.   Therefore, there is no error in the ALJ's credibility assessment.

Turning his attention to the opinion evidence, the ALJ accorded significant weight to the findings of psychiatric consultative examiner Dr. Finnity who assessed Plaintiff as having difficulty with attention, concentration, relating with others and dealing with stress, an opinion which the ALJ found to be based on a comprehensive examination, within Dr. Finnity's area of

specialization and, importantly, was both consistent with the record as a whole and uncontradicted by the opinion of any treating or examining medical source. *Id.*

Considering, but assigning little weight to the internal medicine examination report provided by consultative examiner Dr. Toor, the ALJ found his opinion that Plaintiff would have moderate limitations standing, walking, squatting, and lifting and should avoid heavy exertion, irritants, heights, and operating machinery to be inconsistent with the medical record as a whole and with the doctor's own contemporaneous examination results which revealed a slight limp and limited squatting. *Id.* The ALJ considered that the history and allegations provided by Plaintiff on the same day to Dr. Toor and Dr. Finnity differed in numerous significant particulars. *Id.*

Without question, the opinion of a consultative examiner may constitute substantial evidence supporting an ALJ's decision. *See Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995). The report of a consultative physician who examines the Plaintiff and reaches conclusions based upon a one-time examination may constitute substantial evidence in support of the ALJ's decision. *Monguer v. Heckler*, 722 F.2d at 1039. I agree with the Commissioner that the ALJ's decision to give significant weight to the consultative psychiatric evaluation of Dr. Finnity was proper. I also agree with the Commissioner that the ALJ's decision to accord little weight to Dr. Toor's internal medicine report and findings was proper and not error, given the internal inconsistencies and the report's inconsistency with the medical record as a whole.

The ALJ also gave significant weight to the two opinions rendered in June 2010 (no physical limitations) and June 2011 (capable of work at the medium exertional level) by Dr. Brown, Plaintiff's primary treating physician, regarding his functioning, except the allegation in the June 2011 report that Plaintiff would be off task 20% of the workday and absent three days monthly. The ALJ astutely reasoned that while the remainder of Dr. Brown's opinions were

consistent with the record as a whole and based upon a longitudinal treatment history, this allegation was based upon emotional factors outside the scope of Dr. Brown's treatment of Plaintiff, and was unsupported by the doctor's own treatment notes or those of Plaintiff's mental health providers.

The treating physician rule provides that an ALJ should defer "to the views of the treating physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). A treating physician's opinion as to the nature and severity of a claimant's impairment is given controlling weight by the Commissioner, if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); SSR 96-2P; *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). I concur that in the instant circumstances, the ALJ correctly applied the treating physician rule in weighing the opinion of Doctor. Brown.

Finding that Plaintiff was unable to perform his past relevant work as a driving instructor and medical transport driver because the requirements of these positions exceeded the RFC, and additionally, that his ability to perform all or substantially all of the requirements of medium work had been impeded by additional limitations, and in order to determine the extent to which such limitations "erode[d] the unskilled medium occupational base," the ALJ asked the testifying VE whether jobs existed in the national economy for a hypothetical claimant with Plaintiff's age, education, work experience, and residual functional capacity. R. 23-24. Based upon the VE's testimony that, considering all of the factors, Plaintiff was able to perform jobs such as table worker (20,670 positions in the New York State economy; 464,000 positions in the national economy); hand packager (21,000 positions in the New York State economy; 400,000 positions in the national economy); and cleaner-housekeeper (23,000 jobs in the New York State

economy; 498,000 positions in the national economy), the ALJ concluded that Plaintiff was capable of making a successful adjustment to other work existing in significant numbers in the national economy and, consequently, a finding of disabled was not appropriate. R. 24. The ALJ's RFC finding was supported by substantial evidence and, therefore, formed an accurate basis upon which the VE could testify.

Therefore, for the reasons set forth herein above, the Court finds no reasons for reversal of the Commissioner's decision denying Plaintiff SSI and DIB, because he was not disabled since June 21, 2008.

## IV.   **CONCLUSION**

For all of the foregoing reasons, and after careful consideration of the entire record, I find that the Commissioner's determination was supported by substantial evidence in the record and was not erroneous as a matter of law.   Accordingly, the Commissioner's determination is affirmed.  The Court hereby GRANTS Defendant's Motion for Judgment on the Pleadings (ECF No. 11).  The Court orders that Plaintiff's Complaint (ECF No. 1) be dismissed, and the Clerk of the Court is directed to close Civil Case No. 13-CV-6184.

IT IS SO ORDERED.

Dated: December 22, 2014
      Rochester, New York

HON. FRANK P. GERACI, JR.
United States District Judge